**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO,**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Traevon Plaintiff** | : | **Case No.:** |
| **327 Barnhart Dr.** | : | |
| **Chillicothe, OH 44601** | : | |
| | : | **Judge:** |
| **Plaintiff,** | : | |
| | : | |
| **-vs-** | : | **PLAINTIFF'S COMPLAINT FOR** |
| | : | **DAMAGES AND INJUNCTIVE RELIEF** |
| **City of Chillicothe** | : | |
| **35 S. Paint St.** | : | |
| **Chillicothe, OH 45601** | : | |
| | : | |
| **Chillicothe Police Department** | : | |
| **28 N. Paint St. B** | : | |
| **Chillicothe, OH 45601** | : | **(Jury Demand Endorsed Herein)** |
| | : | |
| **Defendants.** | : | |

## I.     INTRODUCTION

1.     This action is a civil rights action brought by the Plaintiff against his employer based on racial discrimination and retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended, among other federal and state laws arising from race discrimination and retaliation against the Plaintiff, Traevon Williams, an African-American police officer, by Defendants City of Chillicothe and the Chillicothe Police Department. Officer Williams was repeatedly subjected to hostile and discriminatory conduct, including the denial of training, opportunity and advancement, due to his race and in retaliation for filing claims against CPD internally and with the Ohio Civil Rights Commission. Officer William's experiences are symptomatic of a pattern, practice, and policy of discriminatory treatment of minority officers.

## II. PARTIES AND JURISDICTION

2.    At all times relevant herein, Plaintiff, Traevon Williams, has resided in the County of Ross, State of Ohio.

3.    At all times relevant herein, Defendant, City of Chillicothe, Ohio (hereinafter "the City"), is a municipal corporation and a political subdivision of the State of Ohio, responsible for governing Chillicothe, Ohio, which is in Ross County. The City's agencies include Defendant Chillicothe Police Department (hereinafter referred to as "CPD"), its primary law enforcement agency. CPD is an entity authorized to do business in the State of Ohio, including, but not limited to, Ross County, Ohio.

4.    Defendants employs four (4) or more employees with the State of Ohio, and therefore Defendant is an "employer" as defined by the Ohio Revised Code Section 4112.01(A)(2).

5.    This Court has jurisdiction over the claims under 28 U.S.C. § 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction). Plaintiff received a Right to Sue Letter from the Ohio Civil Rights Commission on June 5, 2022, less than 90 days ago. (***Exhibit A).***

6.    Venue lies in the Southern District of Ohio because the facts leading to the dispute between the parties occurred in Ross County, Ohio, within this District, and the Defendants are doing business in this District.

## III. GENERAL ALLEGATIONS (STATEMENT OF FACTS)

7.    On or about October 5, 2017, Plaintiff was provided an offer of employment by the CPD upon successfully completing certain criteria including a polygraph examination, background check and drug screen.

8.    On or about December 27, 2017, Plaintiff began employment with the CPD.

9.     Plaintiff filed a complaint with the Commission on or about August 20, 2021, for race/color discrimination and retaliation.

10.    When Plaintiff was hired, he took a civil service test and only three (3) individuals were hired off this test: a white male Officer Shane Daubenmire ("Officer Daubenmire"), a Hispanic female Officer Abigail Tomlinson ("Officer Tomlinson") and the Plaintiff, a black male.

11.    Plaintiff was hired by the department with 4 years' experience and requested a lateral transfer to be hired in at a higher pay rate, additional weeks of vacation, and other benefits.

12.    Plaintiff was told "no" that the department did not do lateral transfers.

13.    Several months later, Officer Daubenmire was hired by the Defendants with three (3) years' experience and given a lateral at a higher pay scale at almost $10 more on the hour than Plaintiff.

14.    Officers Daubenmire, Tomlinson and Williams all took the same test, which means they should have been hired under the same rules and standards.[1]

15.    Since Plaintiff's hire date, CPD has hired roughly 20+ white officers.

16.    Plaintiff spoke to one black officer who applied with the CPD, and they ignored him, so he took a job at a neighboring agency.[2]

17.    Currently, there are approximately 44 police officers employed with CPD.[3]

---

[1] If CPD would have decided to accept laterals after Plaintiff test expired and begin the process, then it would have been different. There is clear differential treatment.

[2] On or about July 2021, Samuel Payne applied with Chillicothe but took a job at Ross County Sheriffs Office ("RCSO"). Plaintiff asked him why he chose that job (since they made a lot less than Chillicothe officers) and he said that Captain Christopher Dubay was dragging his feet, ignoring him and hired several other white officers over him so he applied at RCSO and was hired.

[3] Including Officer Claimant Williams, there consists of three black male officers, 1 black female officer, 1 Hispanic female officer, 2 white female officers and the remaining officers are white male.

18. On February 24, 2018, Plaintiff received a personnel performance review in which the following comments were made:

> On Personality— "Officer is courteous and polite when dealing with public. Officer has a how may I help you mentality."
>
> On Initiative--"Officer is motivated and eager to learn. Officer is taking initiative and has no complaints about accepting a heavy workload."
>
> On Judgement— "Officer makes smart decisions and sound judgment. Only issue is learning dept. policies and procedures in situations that are new to him."
>
> On Adaptability— "Officer easily adapts to change and seems to learn quickly."
>
> On Dependability – "No issues."
>
> On Cooperation— "Officer is a good fit for our team and seems to get along well with all others. Officer seems to take constructive criticism in stride."
>
> On Physical Ability—"No issues."

19. On November 8th, 2018, Chief of Police Keith Washburn (now retired) ("Chief Washburn" or "Officer Washburn") sent a departmental email to all employees of the CPD stating that Retired Sergeant Michael Short ("Sergeant Short" or later "Captain Short" in January 2021), K9 Kobi Handler, was going to be retiring from K9 Kobi in the Spring of 2019 and the Ohio State Highway Patrol (OSHP) would conduct a multi-phase assessment for any applicant interested in the position. This email did not specify any requirements other than having a stable home environment and not living in a studio apartment.

20. In January 2019, Captain Ron Myers ("Captain Myers") (later "Chief Myers" beginning 2020) issued Plaintiff a letter indicating that he has "demonstrated outstanding dependability and reliability" in his performance and in in his "attendance."

21. On February 5, 2019, Plaintiff responded to Chief Washburn asking if there was a seniority requirement for the K9 handler position and he replied "no."

22. On February 6, 2019, Chief Washburn sends out a memo to all personnel that the K9 Handler assessment will be Friday, February 15th at 11:00 a.m.

23. In a letter dated February 11, 2019, Plaintiff wrote to Chief Washburn that he would like to apply for the K9 position, and he enclosed his application materials detailing his experience, training and capabilities.

24. Plaintiff was notified that Officers Monique Lee ("Officer Lee"), Christopher Claytor ("Officer Claytor"), Shane Simmons ("Officer Simmons"), Morgan Music ("Officer Music") were the only other applicants to apply for this position.

25. Plaintiff was the only applicant to *submit an application* for this position expressing himself as a highly motivated and qualified candidate—if not the most qualified candidate for the position.

26. Plaintiff, Officer Simmons and Officer Music passed the written and practical test.

27. Plaintiff scored the highest on the written test and the practical test*;* however, Officer Simmons and Officer Music along with Plaintiff would both move on to the last stage being an interview.

28. The interview was completed individually and in presence was Officer Washburn and three (3) OSHP Troopers.

29. After the evaluations were completed, Plaintiff was told by the evaluators that he was chosen for the K9 handler position.

30.   CPD's practice has always been to select the candidate that OSHP selects.[4]

31.   Plaintiff was told by the CPD K9 Handlers and Detectives that he was chosen for the K9 handler position, and they all shook Plaintiff' hand.

32.   Officer Washburn told Plaintiff that he would have a sit down with him and Captain Bamfield (now retired) about the next steps and expectations for the K9 handler position.

33.   After that conversation, Officer Washburn told Plaintiff that he was **not** chosen by OSHP and that Officer Simmons was chosen instead.

34.   Plaintiff replied to Officer Washburn that CPD and OSHP personally informed him that he was chosen for the K9 handler position and that he was told that he outscored each test by high numbers.

35.   Officer Washburn then stated that he no longer had the test scores to confirm but that the sole reason for Plaintiff to not be chosen was due to him living in an apartment.

36.   Plaintiff explained to Officer Washburn that he had no longer lived in an apartment and that he had not for an extended period which was also documented on department paperwork per policy[5].

37.   Then, Officer Washburn stated to Plaintiff that it came down to Officer Simmons having more seniority and experience than Plaintiff.

38.   Plaintiff explained to Officer Washburn that he was informed that seniority did not play a factor in the assessment and that he also had a couple of years of Law Enforcement Education and Experience over Officer Simmons.

---

[4] The past assessment shows (at the time) Officer Casey Cox (no Sergeant), Officer Ben Rhoades and Officer Matt Shipley received the highest score on the assessment and Matt Shipley received the highest score and was selected for the K9 Handler position.

[5] Plaintiff lived in a 3-bedroom fenced in house in a safe area.

39.     Officer Washburn informed Plaintiff that he was not telling Plaintiff that he would not get a K9 and that he was next in line and to just be patient.

40.     Officer Simmons went to K9 school and after his graduation, Plaintiff met with Officer Washburn again and asked him if there was a timeline on when he would be able to obtain the K9 handler position.

41.     Officer Washburn told Plaintiff that if he could gather the funds from the Community with the assistance of Little Blessings Inc., etc. he would allow Plaintiff to obtain a K9 position.

42.     Plaintiff met with Management of Wal-Mart, Nourse, McDonald's franchise owners, Business Owner— Kevin Ross, The Mighty Children's Museum, Little Blessings Inc., and various other businesses where he obtained the funding to purchase the K9, equipment, vehicle accessories and everything to avoid any cost to Chillicothe City Budget except for the vehicle.

43.     However, there were a few cruisers available including an old K9 Cruiser.

44.     Plaintiff asked Officer Washburn if he was able to keep and use part of the money, he had fundraised to fix mechanical issues with the old K9 cruiser and Officer Washburn told Plaintiff to reach out to a few car dealerships to purchase a brand-new car.

45.     After putting in the footwork of being able to obtain all the donations, Officer Washburn told Plaintiff to not obtain these donations because Plaintiff will now need to obtain $80,000.00-$100,000.00 to cover total expenses and then he would allow Plaintiff a K9.

46.     Plaintiff spoke with Little Blessings and The Mighty Children's Museum who both agreed to assist with obtaining the funds and then Plaintiff found out Officer Washburn was retiring.

47. Plaintiff discussed this with several of the current CPD Sergeants and handlers who all expressed that in no time in the past did seniority play a factor in the decision of the canine handlers.

48. Plaintiff mentioned several times to CPD Sergeants and K9 Handler Officer Chris King and K9 Handler Officer Matt Shipley how it seemed more that the department did not want him to be the first black canine handler and they told Plaintiff several times that no white officer was tasked with obtaining the funds from the community to purchase a K9, vehicle, and equipment and that it seemed as if he was being played as a dummy.

49. Sergeant Short (now Captain Short), who was a previous K9 Sergeant, also commented about how there were no white officers ever being tasked with gathering funds.

50. On March 1, 2020, Plaintiff received a performance review from Sergeant Hansen and Sergeant Pete Shaw ("Sergeant Shaw") that states in part that he needs to improve in his ability to deal with possible offenders.

51. Plaintiff wrote a handwritten response about this review in which he was treated unfairly and with bias, in which officers redacted before placing this in his file.

52. Since the filing of this Complaint, CPD continues to add more items to Plaintiff's personnel file.

53. On or about April 3, 2020, Plaintiff reached out to Officer Washburn again about the K9 handler position and he told Plaintiff to no longer make attempts at getting the funds and that he was retiring, but, however, the Captain's below him were aware of Plaintiff' ambitions to be a K9 Handler and that once a new Chief of Police was in place, arrangements would be made for the next K9 position to be for Plaintiff.

54. On or about July 23, 2020, Officer Claytor and Plaintiff were in the briefing room discussing Officer Claytor being discriminated against when he applied for the SWAT team and Plaintiff being discriminated against with the K9 handler position.[6]

55. During this conversation, Sergeant Shaw entered the room and Officer Claytor and Plaintiff asked Sergeant Shaw if there had ever been any minorities in any of the positions on seniority at the department since he had been there and he laughed and said, "yea right, I almost did not make the SWAT team because I was too tan."

56. On or about September 10, 2020, Plaintiff contacted Sergeant Short and forwarded him a K9 Grant provided by the Aftermath K9 Grant and advised him that he would complete the necessary requirements to obtain this grant. Captain Timothy Gay ("Captain Gay") replied to this email telling Plaintiff that at this time the agency would not explore the position and that in the future if one of the handlers retired, he would be considered again.

57. In 2020, all CPD minorities were passed over for advancement within CPD and a Detective Position became available that was hand selected and given to a white male officer.

58. Several minorities complained to CPD supervisors, and shortly after, another Detective Position became available.

59. This time the Detective Position was not posted for sign-up to allow other officers a fair opportunity to apply for the position when yet again another non-minority officer was chosen.

60. Plaintiff has requested several training classes and he has been ignored or denied each time.

---

[6] In 2017, there was SWAT position open applied for by black male Officer Christopher Claytor ("Officer Claytor") and white male Officer Moore. Officer Moore out tested Officer Clayton and was given that position. Officer Claytor did pass so he was on standby for the next position and less than a month later Officer Morgan Music ("Officer Music") was given a SWAT position without testing for it and Officer Claytor was not given a chance to be placed on the team.

61. Plaintiff asked CPD at times for training and even offered CPD to pay for classes and was ignored, while white male officers were always afforded the opportunity to attend free and/or paid training, and among them were officers that have less seniority than all the minorities including Plaintiff.

62. This has discouraged Plaintiff (and other minorities) from applying for positions or training.

63. On or about March 17, 2020, Plaintiff reached out to Human Resource Director Tamara Lowe ("HR Director Lowe") and asked to speak with her about this incident.

64. Plaintiff spoke with HR Director Lowe on or about March 18-19, 2020 and informed her of these issues.

65. Due to Captain Washburn leading Plaintiff on with frivolous tasks, HR Director Lowe and Plaintiff agreed to discuss this issue again on April 28, 2020, April 29, 2020, and May 1, 2020.

66. HR Director Lowe was working remotely at this time but stated that she would document and open an EEO investigation.

67. HR Director Lowe retired shortly after.

68. There was a big gap of time before a new HR Director was hired.

69. Plaintiff and other minority policy officers have discussed these issues with the Defendant's administration, and it has been taken by Plaintiff superiors as a joke and as far as that the complaining police officers result in the middle of a frivolous Internal Affairs ("IA") Investigation or criminal investigation.

70. Before filing with the OCRC, Plaintiff has been a part of two IA Investigations where he was treated different for the same exact conduct as white officers, in which the white officers were not treated differently, and the IA investigation has been unfounded.[7]

71. After filing charges with the OCRC, Plaintiff has been put under another IA investigation that is currently being investigated by the OCRC.

72. Plaintiff has reached out to OSP Troopers Stoney Johnson and Dana Hutton, administrators over the OSP canine program, inquiring about the K9 position and testing.

73. Plaintiff was advised that they were upset how the process went due to being told that the selected candidate (Plaintiff) was going to be the next handler.

74. The evaluators informed Plaintiff that they submitted written results to cover OSP in case a lawsuit comes of the matter.

75. On or about July 15, 2021, Plaintiff reached out to the newly hired Human Resource Director Terrill Barnes ("HR Director Barnes") for an update on the progress of this matter.

76. Plaintiff informed HR Director Barnes that he has gone up the chain of command (per policy: Sergeant, Captain, Chief, and HR) and this must stop.

---

[7] Plaintiff and Officer Claytor were involved in an arrest at Kroger on Western Ave in Chillicothe. During that use of force, the suspect arrested intentionally acted as if he had a gun in his pants. Officer Claytor and Plaintiff called for assistance and Sergeant (at the time) Chris Dubay ignored their request for help and did not respond. Captain Bamfield and Captain Gay accused Officer. Claytor and Plaintiff of excessive use of force and opened an internal investigation on them ("IA"). The suspect was not injured, nor did he make any complaints of excessive force against either of them. Captain Gay treated Plaintiff and Officer Claytor poorly, accused them of wrongdoing, but they were later cleared of any excessive force by an IA Committee. A short time after, white male Officer Lindamood kicked a male in the leg breaking his leg in half and while male officers Sergeant Dubay and Captain Gay bragged about this and never opened an IA on this action. While male Officer Music slammed a man causing severe bleeding for being verbally abusive toward him and Sergeant Dubay and Captain Gay bragged about this incident and even encouraged people to watch the body camera video and they did not open an IA investigation. Plaintiff contacted a suspect for stealing at the local Walmart. The entire interaction was on body camera and Plaintiff was polite to the woman the whole time. This woman filed a complaint against Plaintiff that was plagued with lies. Chief Meyers opened an IA on Plaintiff and even after watching the video and clearing Plaintiff from any wrongdoing, Captain Gay refused to file criminal charges against the woman for lying, and he belittled Plaintiff for a comment Plaintiff made to the woman stating Plaintiff was going to mail her a summons's (because we do not mail summons—we issue a summons or warrant). Captain Gay made this into a big deal until Plaintiff reminded him that Plaintiff did nothing worse than him, or any other officer does and reminded him of worse conduct they committed and are not treated as poorly.

77.     HR Director Barnes advised Plaintiff that he was not able to locate any documentation from previous HR Director Ms. Lowe but would proceed with the matter and follow up with Plaintiff.

78.     In this matter, CPD asserted in its position statement to the OCRC the following: "While the HR Director offered to further pursue this matter, Mr. Williams declined, saying that he would think about it and that he did not have time. Mr. Williams subsequently confirmed that he did not want to further pursue this matter."

79.     The above factual allegations are incorrect as Plaintiff always insisted to HR Director Barnes to take further action.

80.     HR Director Barnes indicated he would have to talk to his Supervisor the Safety Director first.

81.     Later, HR Director Barnes informed Plaintiff that he could not pursue the investigation because the Safety Director said "no"[8]

82.     In January 2021, Captain Short sent out a departmental email for the position of a driving instructor.

83.     A few days after making this email, Captain Short stopped and talked to Officer Claytor and Plaintiff in the briefing room and asked if either of them was going to apply for the positions and stated that not many officers applied.

84.     Plaintiff told Captain Short that he was not going to consider each position as when a minority applies, they get passed over even if they are the most qualified or best fit for the position.

---

[8] Note, the Safety Director reports to Chief of Police Ron Myers.

85. Captain Short explained that these actions did not occur under his authority as a captain and ensured that he would do his best to ensure a fair and equal process would be given to each applicant for any training or opportunity.

86. Since then, Captain Short reached out to Plaintiff about a training class in July 2021 but due to a pending court case Plaintiff was not able to attend.

87. On August 20, 2021, Plaintiff made a complaint to HR Director Terrill Barnes for hostile work environment, retaliation and worsening of treatment by CPD toward Plaintiff.

88. CPD scheduled Plaintiff to attend child seat training the of week of October 26-29th, the same week of mandatory drivers training class in which Plaintiff was to attend.

89. Plaintiff messaged Officer Short and said he could not attend driving training and child safety course being the driving training was going to have him on the course from 7pm-3am and he had to be in another county at 7am to the child safety course from 7am-4pm.

90. Officer Short told Plaintiff that he had to go to the driving training class—even though it was not a state required class.

91. CPD recently made the drivers training class mandatory after Plaintiff filed his complaint with OCRC.

92. CPD informed Plaintiff that he could not reschedule it, he had no other option, and that he had to do both trainings.

93. CPD informed Plaintiff that he would have to pay the driving training Officer for his time off.

94. Three (3) white males did not show up to the driving class that are going to get to make it up and they do not have to pay the driving trainer, but I was told that if I missed it, I would have to pay his overtime rate on his time off and make arrangements.

95.   CPD offered Plaintiff active shooter training on the day Plaintiff's child was due to be born and he was to be out on Family Medical Leave.

96.   On February 11, 2022, Plaintiff met with HR Director Barnes and Safety Director Jeff Carman ("Safety Director Carman") to again request a formal complaint to be filed for hostile work environment, retaliation and worsening of treatment by CPD toward Plaintiff.

97.   Later that day, on February 11, 2022, Captain Short called Plaintiff ordering Plaintiff to Safety Director Carman's office.

98.   Captain Short told Plaintiff that if he did not hurry and get there, Plaintiff would face disciplinary action.

99.   Plaintiff asked Captain Short if he was allowed to bring union representation, or an attorney and he told Plaintiff "no" and to hurry and get there.

100.   Plaintiff responded and while en route, made several calls to union representatives and was not able to get in touch with a union representative.

101.   Plaintiff called a co-worker, Officer Monique Lee ("Officer Lee"), and asked her to respond and witness the meeting for Plaintiff and she did so.

102.   Upon arrival, Plaintiff notified Captain Short that he wanted a lawyer, or a union representative.

103.   Captain Short told Plaintiff several times that he was not allowed to wait for one and that if Plaintiff did not come inside, he would face disciplinary actions for insubordination.

104.   Captain Short told Officer Lee to encourage Plaintiff to come inside before Plaintiff got in trouble.

105.   Plaintiff told Captain Short several times that he was trying to call a union representative or attorney.

106. Captain Short denied Plaintiff time to wait for a union representative.

107. Once inside, Plaintiff was met by Captain Short, Sergeant Dubay, Chief Myers and Safety Director Carman and they permitted Plaintiff to bring Officer Lee in as a witness.

108. As Plaintiff and Safety Director Carman began talking, Plaintiff explained to Safety Director Carman that he was very uncomfortable, the meeting was inappropriate and that he was forced to be there against his will.

109. Plaintiff explained that he did believe it was inappropriate to force him into a room with the very people he was filing a complaint against and that he would be forced to leave and work with them allowing them a further chance to retaliate against Plaintiff.

110. Safety Director Carman ended the meeting.

111. After leaving, Plaintiff notified Safety Director Carman that he wanted to file a complaint with him without Chief Myers, Captain Short and Sergeant Dubay present.

112. Safety Director Carman agreed to meet with Plaintiff three (3) days later.

113. On February 17, 2022, Safety Director Carman and HR Director Barnes cancelled the meeting scheduled with Plaintiff because Plaintiff's complaint pointed toward racial discrimination.

114. Plaintiff replied pleading for Safety Director Carman and HR Director Barnes to help Plaintiff and they never responded to Plaintiff.

115. On March 21, 2022, Plaintiff made an arrest of a subject he believed to be armed and used minimal force on the subject (i.e., pepper spray and physical restraint).

116. This subject was arrested and charged with resisting arrest and disorderly conduct/intoxication.

117. The arrestee hired an attorney, pled guilty, and was found guilty on March 23, 2022.

118.    The case was reviewed by three (3) sergeants, a use of force officer, and another officer, law director and defense attorney who all never complained of issues.

119.    On March 25, 2022, Captain Tim Gay left a note for Sergeant Tuttle and Sergeant Cox requesting the cases to be further reviewed.

120.    Captain Gay accused Plaintiff of illegally arresting the subject, violating his rights and excessive use of force because the subject was contacted four (4) days later for having a seizure.

121.    Plaintiff attempted to discuss the matter with Captain Gay on March 31, 2022, and all Captain Gay did was mock Plaintiff, belittle Plaintiff, and tell Plaintiff that he violated the arrestee.

122.    In the CPD, there is no fair and equal treatment to minorities especially when it comes to training, opportunity, and advancement.[9].

123.    Non-minority (i.e., white male) officers and supervisors also see the unequal treatment and make comments weekly about this to the minority officers.

124.    The other minority officers are afraid to step up and jeopardize their livelihood.[10]

125.    Plaintiff has made two documented attempts to the administration to stop ongoing targeting and discrimination/harassment from supervisors which ultimately led to worsening of the treatment.

---

[9] This includes females. In Summer of 2021, Abigail Tomlison was not given a fair male/female assessment for physical fitness. She had to do the same number of runs, pushups, sit-ups, etc. as the males applying for the SWAT position.

[10] Note: Former Officer Reggie Netter ("Officer Netter") retired in the summer of 2020. He died several months after retirement. Officer Netter was a black officer who was fired by CPD and was in the process of filing a discrimination lawsuit against the CPD.  Officer Netter was fired because he attempted to punch a male across the face after being called a racial slur. Officer Netter's termination was overturned because Sergeant Dubay slammed a man, causing him to be life flighted where he almost died—and Sergeant Dubay only received a minor discipline of a write up. Officer Netter's case is a prime example of the differential treatment of the CPD toward people of race/color.

126. This targeting has discouraged further actions such as this underlying complaint.

127. Plaintiff is aware of other officers making similar complaints to administration which resulted in worsening or discouraging actions.

128. Plaintiff has filed several Charges of Discrimination jointly with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission regarding the ongoing harassment, discrimination and retaliation by the CPD toward Plaintiff.

129. Plaintiff requested a Dismissal and Notice of Rights ("Right to Sue Letter") on his April 5, 2022 charge dated April 6, 2022 that was issued to Plaintiff by the OCRC on June 5, 2022.

## IV. CAUSES OF ACTION

### COUNT I

**RACIAL DISCRIMINATION – TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND R.C. §4112.02**

130. The preceding paragraphs are incorporated by reference as if fully restated herein.

131. At all times relevant, Plaintiff was a member of a class protected from discrimination.

132. Defendants have engaged in intentional race discrimination and retaliation in the terms and conditions of Plaintiff's employment.

133. During Plaintiff's employment, similarly-situated non-protected employees were treated more favorably than Plaintiff.

134. As set forth throughout this Complaint, Defendants ratified the conduct of its employees, agents and/or authorized representatives by its actions and/or inactions with respect to Plaintiff.

135. As a direct and proximate result of the actions and/or inactions of Defendants, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but

not limited to serious emotional distress and loss of salary, benefits and other terms, privileges, and conditions of employment for which Defendants are liable.

136. The Defendants' conduct was willful, wanton, reckless, and/or malicious for which Defendants are liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

## COUNT II

### RETALIATION – TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND R.C. §4112.02

137. The preceding paragraphs are incorporated by reference as if fully restated herein.

138. Plaintiff engaged in a protected activity by, *inter alia*, opposing the discriminatory treatment he was suffering.

139. The Defendants intentionally retaliated against Plaintiff for engaging in one or more protected activities by (a) denying promotion; (b) denying training; (c) subjecting Plaintiff to changes in the department policies that had an adverse effect on Plaintiff; and/or (d) otherwise discriminating against Plaintiff in the terms, privileges, and conditions of employment.

140. As a direct and proximate result of the actions and/or inactions of Defendants, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to serious emotional distress and loss of salary, benefits and other terms, privileges, and conditions of employment for which Defendants are liable.

141. The Defendants' conduct was willful, wanton, reckless, and/or malicious for which Defendants are liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

## COUNT III

**RACE DISCRIMINATION/RETALIATION – R.C. §4112.99**

142.    The preceding paragraphs are incorporated by reference as if fully restated herein.

143.    Defendants discriminated against Plaintiff because of his race by creating a hostile work environment and treating similarly-situated non-protected employees more favorably than Plaintiff in violation of §4112.02 of the Ohio Revised Code.

144.    Defendants' violations of §4112.02 of the Ohio Revised Code are violations of §4112.99 of the Ohio Revised Code.

145.    As a direct and proximate result of the actions and/or inactions of Defendants, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to serious emotional distress and loss of salary, benefits and other terms, privileges, and conditions of employment for which Defendants are liable.

146.    The Defendants' conduct was willful, wanton, reckless, and/or malicious for which Defendants are liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

## COUNT IV

**DISCRIMINATION IN VIOLATION OF 52 U.S.C. § 1983**

147.    The preceding paragraphs are incorporated by reference as if fully restated herein.

148.    By denying Plaintiff the enjoyment of her employment contract because of her race, Defendants CPD violated 42 U.S.C. § 1983.

## V.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

1.    For actual, compensatory, and consequential damages in excess of Seventy-Five Thousand Dollars and 00/100 ($75,000.00);

2.      For punitive damages as a result of the wrongful acts complained of herein in excess of Seventy-Five Thousand Dollars and 00/100 ($75,000.00);

3.      That this Court issue an Order restraining and enjoining Defendants from continuing its unlawful employment practices;

4.      For reasonable attorney's fees in an amount to be determined; and

5.      For costs and other such relief, in law or equity, as this Court deems just and proper, including but not limited to pre-judgment and post judgment interest.

Respectfully submitted,

/s/ Jessica A. Barwell                          /s/ Brian K. Duncan
Jessica A. Barwell (0088716)            Brian K. Duncan (0080751)
Gregory P. Barwell (0070545)          **BKD Legal LLC**
Jud R. Mauger                                     119 E. Granville Street
**WESP BARWELL, L.L.C.**                    Sunbury, Ohio 43074
475 Metro Place S. Suite 430             P: (740) 965-1347
Dublin, OH 43017                              F: (614) 386-0410
P+F: (614) 456-0488                          bduncan@bkdlegal.com
jbarwell@wesplaw.com                      *Lead Trial Counsel for Plaintiff*
gbarwell@wesplaw.com
*Trial Counsel for Plaintiff*

## **JURY TRIAL DEMANDED**

Plaintiff respectfully requests a jury trial on all triable issues.

/s/ *Jessica A. Barwell*
Jessica A. Barwell (0088716)
*Trial Counsel for Plaintiff*

## **MILITARY ATTESTATION**

Attorney Jessica A. Barwell, being duly sworn, states that he an attorney for Plaintiff and that the Defendants are not in the United States Military Service.

/s/ *Jessica A. Barwell*
Jessica A. Barwell (0088716)
*Trial Counsel for Plaintiff*

**EXHIBIT "A"**

**EEOC Dismissal and Notice of Rights Letter Dated June 5, 2022**

**(See Attached)**